**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION**

**JASON DOUGLAS PROCTOR,**
            **Plaintiff,**

**v.**                                                        **CIVIL ACTION NO. 2:15-16255**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**
                  **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Orders entered December 21, 2015, and January 5, 2016 (Document Nos. 4 and 7.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 13.)

The Plaintiff, Jason Douglas Proctor (hereinafter referred to as "Claimant"), filed an application for DIB on August 20, 2012 (protective filing date), alleging disability as of March 30, 2012, due to back injury, leg injury, weakness in legs, and depression.[1] (Tr. at 83, 96, 193.) The claims were denied initially and upon reconsideration. (Tr. at 110-114, 116-122.) On April 10, 2013, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 123-124.) A hearing was held on June 25, 2014, before the Honorable John T. Molleur. (Tr. at 29-65.) By decision dated July 18, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr.

---

[1] On his form Disability Report - Appeal, dated April 10, 2013, Claimant asserted that he experienced increased pain and was "more depressed". (Tr. at 223.)

at 12-28.) The ALJ's decision became the final decision of the Commissioner on November 2, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-7.) Claimant filed the present action seeking judicial review of the administrative decision on December 18, 2015, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4ᵗʰ Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4ᵗʰ Cir. 1981). The burden then shifts to the Commissioner, per McLain v. Schweiker, 715 F.2d 866, 868-69 (4ᵗʰ Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful

2

activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(C) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

      (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). [2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, March 30, 2012. (Tr. at 14, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "degenerative joint disease of the left knee and ankle with fused left ankle, scoliosis, degenerative disc disease of the lumbar spine, major depressive disorder, generalized anxiety disorder, pain disorder, and alcohol abuse," which were severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform sedentary work, as follows:

> [C]laimant has the residual functional capacity to perform sedentary work as able to lift and carry 10 pounds occasionally, except this individual is able to stand and walk for 4 hours in an 8-hour day, and able to sit for 4 hours in an 8-hour work day. He is capable of performing all postural activities on an occasional basis, except the [C]laimant should avoid climbing ladders, ropes, or scaffolds, have no direct exposure to vibrations and should have no work on unprotected heights, or any close proximity to moving machinery like forklifts. The individual is limited to jobs that do not require reading or writing above a 6th grade level.

5

(Tr. at 19, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform past relevant work, which was primarily characterized as heavy work. (Tr. at 22, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was thirty-three years old as of the onset date of disability, which is defined as a younger individual. (Tr. at 22, Finding No. 7.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Tr. at 22, Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Tr. at 22, Finding Nos. 9, 10.) On this basis, benefits were denied. (Tr. at 24, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

6

the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v.</u> <u>Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on August 16, 1978, and was 36 years old at the time of the administrative hearing, June 25, 2014. (Tr. at 22, 39, 167.) Claimant had at least a high school education, having attended special education classes in all subjects, and was able to communicate in English. (Tr. at 39, 192, 193, 194[3].) He previously worked as an oil rig hand and operator. (Tr. at 22, 39-40, 194.)

<u>The Medical Record</u>

The Court has considered all evidence of record, including the medical evidence, and discusses it below in relation to Claimant's arguments.

<u>*Evidence Prior to Alleged Onset Date, March 30, 2012*</u>:

<u>Charleston Area Medical Center</u>

On March 7, 2011, Claimant presented to the emergency department at Roane General Hospital due to complaints of right lower abdominal pain. (Tr. at 270-294, 330-333.) After being stabilized for the pain and determining that Claimant was suffering from acute appendicitis, Claimant was transferred to Charleston Area Medical Center for an emergency appendectomy. (Tr. at 288, 243-262.) An examination of his extremities indicated a normal range of motion and normal back examination. (Tr. at 272.)

---

[3] In his form Disability Report, dated September 8, 2012, under the Education and Training Information, Claimant indicated that the highest grade of school completed was the 12th grade, but did not attend special education classes. It is noted that Claimant's attorney assisted in his completing the report, however. (Tr. at 193.)

<u>Roane General Hospital</u>

On June 16, 2011, x-rays taken of Claimant's "right"[4] leg indicated extensive postsurgical changes, noted both proximally and distally in the tibia. (Tr. at 267.) Visible bones were osteoporotic, with no acute bony abnormality or fracture seen. (<u>Id</u>.) X-rays of the left knee also indicated postsurgical and posttraumatic changes with no acute bony abnormality. (Tr. at 268.) X-rays of the left foot indicated postsurgical changes, with visible bones diffusely osteoporotic, and noted fusion of the ankle. (<u>Id</u>.) No acute bony abnormality seen. (<u>Id</u>.)

*Evidence After the Alleged Onset Date, March 30, 2012*:

<u>Saint Francis Hospital</u>

On September 23, 2012, Claimant presented to the emergency room due to back pain causing both of his legs to go numb that was precipitated by a fall down a set of steps a month prior.[5] (Tr. at 377-398.) Claimant also complained of right ear bleeding that had persisted for two days. (Tr. at 379.) X-rays of the thoracic spine indicated "mild dextroscoliotic curvature of the thoracic spine which may be at least partially positional in nature. Mild multilevel thoracic spondylosis." (Tr. at 396.) X-rays of the lumbar spine showed "partial sacraligation of L5 with a left-sided pseudoarticulation. Minimal multilevel degenerative disc disease." (Tr. at 397.)

On April 18, 2013, Claimant went back to Saint Francis for chest pain, though it resolved prior to his arrival; he reported that he was sitting on his porch drinking his eighth beer when he developed indigestion. (Tr. at 334-376.) An x-ray of his chest indicated no acute cardiopulmonary disease. (Tr. at 350, 366.) Claimant was advised of the risk of continued heavy alcohol use; it was

---

[4] The record identifies this x-ray as being of the right leg, however, a review of the record as a whole suggests that this is a misidentification.
[5] A patient record indicates that Claimant reported that he "injured his back a couple of times at work approx 1 month ago and now recently fell down stairs[.]" (Tr. at 381.) Another record indicates that Claimant "reports he fell down several steps several months ago." (Tr. at 390.)

noted that his sister was at his bedside laughing inappropriately during this conversation. (Tr. at 342.) Claimant was discharged that day with final diagnoses of non-cardiac chest pain, dyspepsia, mild alcoholic hepatitis, and lipase elevation without evidence of acute pancreatitis, tobacco abuse, alcohol abuse, and chronic headaches. (Tr. at 349.) His symptoms were thought to be likely the result of excessive alcohol consumption in association with spicy food. (Tr. at 343.) Claimant advised he did not want to stop drinking at the time. (Id.)

Roane General Medical Clinic

On April 11, 2012, Claimant presented to the clinic complaining of mood changes (irritability) that had been going on for the past year (Tr. at 327-329.); he denied feeling depressed, denied suicidal ideation, and denied sleep disturbance. (Tr. at 328.) Claimant was prescribed fluoxetine Hcl (Fluoxetine) 20 mg. (Tr. at 329.) On May 21, 2012, during a follow-up visit for his anxiety with depression, Claimant received a prescription for Xanax 1 mg and a refill for fluoxetine hydrochloride (Prozac) 20 mg; Claimant also wanted a cyst on the right side of his neck removed. (Tr. at 324-326.) On June 21, 2012, Claimant underwent an excision of the sebaceous cyst in his right jaw (Tr. at 263-264, 295-296.) On July 9, 2012, Claimant reported to the clinic for refills on a prescription of Prozac (20 mg) for his anxiety; he denied suicidal ideations and his mental status was grossly normal, with normal affect and judgment. (Tr. at 321-323.)

On October 3, 2012, Claimant had a follow-up visit for his low back pain due to a fall down steps. (Tr. at 318-320.) Prescriptions for ibuprofen (Motrin) 800 mg, alprazolam (Xanax) 1 mg, and fluoxetine hydrochloride (Prozac) 40 mg were issued. (Tr. at 320.)

Records dating December 17, 2012 indicated that Claimant was treated by Dr. Grant Parkins, D.O., regarding a sprained rotator cuff in his left shoulder through physical therapy and a home program. (Tr. at 466-468.) Records indicate that Claimant did not show for his physical

9

therapy appointments on December 17, 2012 (Tr. at 468.) or January 2, 2013. (Tr. at 467.)

On April 23, 2013, Claimant returned to the clinic for follow-up care for his headaches and depression. (Tr. at 441-443.) Because Prozac upset his stomach, Claimant was prescribed Citalopram 20 mg instead. (Tr. at 442-443.) On July 25, 2013, Claimant returned to see Dr. Parkins for follow-up care for his depression and for his medication refills; he reported doing better except for facial pain and postnasal drainage and cough. (Tr. at 433-436.) The mental examination indicated Claimant had normal affect and judgment. (Tr. at 435.)

Roane General Hospital

On February 20, 2013, Claimant presented to urgent care services after having injured his right ankle getting out of a car the night before. (Tr. at 313.) X-rays revealed no apparent fracture or other bony defect, or dislocation to the right ankle; it was normal. (Tr. at 316, 470.) X-rays of the right foot was also normal. (Tr. at 317, 418, 469.)

On March 26, 2013, Claimant returned to the emergency room for his headache pain. (Tr. at 419-420.) He advised hospital staff that he was hit in the back of the head with a baseball bat six months prior and since then he had recurrent headaches. (Tr. at 419.)

On July 27, 2013, Claimant went to the emergency room again complaining of shortness of breath and a "coughing fit". (Tr. at 422-426.) CT scans indicated "pulmony arteries are opacified and there is no pulmonary embolus. There is soft tissue thickening along bronchovascular bundles of the right lower lobe. (Tr. at 425.) Pneumonia was suspected, and a follow-up CT scan was suggested. (Tr. at 426.)

On December 19, 2013, Claimant had a myocardial perfusion scan with exercise stress testing. (Tr. at 427-432, 471-476.) The results were a "normal myocardial perfusion scan with no evidence for myocardial ischemia or infarct. Normal left ventricular ejection fraction." (Tr. at 427,

10

471.)

On April 9, 2014, Claimant presented to the emergency room due to left leg pain. (Tr. at 477-481.) An x-ray revealed that the bones of Claimant's left tibia and fibula were demineralized, therefore decreasing his sensitivity for fracture, and old healing fractures were noted. (Tr. at 481.)

On June 4, 2014, Claimant went back to the emergency room due to pain on his right arm and leg, from having been burned by fire "that he through [sic] gas on." (Tr. at 482-485.) His burns were diagnosed as third and second degree burns, and Claimant was provided Ultracet 325 mg, Neurontin 1 tab PO TID, Motrin 600 mg, Norco 5 mg/325mg, Elavil 10 mg PO BID, Celexa 20 mg PO BID. (Tr. at 484-485.)

Records provided directly to the Appeals Council indicated that on July 14, 2014 Claimant was treated for a lower lip laceration he sustained while playing with his dog (it nipped him); Claimant was given 1 tab of Neurontin, Elavil 10 mg PO BID, Keflex 500 mg, and Celexa 20 mg PO BID. (Tr. at 492-498.) On February 2, 2015, Claimant returned to the emergency room for a cut to his upper right lip he sustained during an altercation; 1 tab of Neurontin was provided. (Tr. at 501-504.)

Bone & Joint Surgeons, Inc.

This evidence was provided to the Appeals Council after the administrative hearing: Claimant saw Dr. Jason A. Castle, M.D. for his left knee pain and stiffness on May 2, 2014 as a follow-up visit. (Tr. at 487-491.) Claimant reported Tramadol and ibuprofen were not effective for relieving the pain, therefore a steroid shot was administered to his left knee. (Tr. at 488.) Dr. Castle instructed Claimant to maintain an active lifestyle and recommended the use of anti-inflammatories, low impact exercise, weight loss with activity modifications to help control the discomfort. (Id.) Dr. Castle stated that Claimant may use an assistive device, such as a cane or

walker as needed. (Id.)

Charleston Area Medical Center

On May 11, 2013, Claimant presented to CAMC with complaints of chest pain, reportedly Claimant was kicked in the chest a few weeks' prior during a disagreement. (Tr. at 399-411, 447-465.) Chest x-rays were negative for rib fracture, though revealed Claimant had developed pneumonia within the right lower lobe of his lung, as well as a contusion, due to the history of trauma. (Tr. at 409, 411, 461, 463.) An x-ray report from Roane General Hospital dated May 22, 2013 indicated that the "hazy right lower lung zone" suggested pneumonia. (Tr. at 421, 437-440.)

Neurology & Headache Clinic, PLLC

On December 20, 2013, Claimant started treatment for his headaches and back pain with Dr. Darshan Dave, M.D. (Tr. at 415-417.) after having been referred by his treating doctor, Dr. Parkins. (Tr. at 444-446.) He was prescribed Neurontin 300 mg for his back pain (Tr. at 417.) On January 28, 2014, Dr. Dave performed a nerve conduction study of Claimant's lower extremities (Tr. at 412-414.) The report stated the "[EMG/NCS] of bilateral lower extremities chronic denervation suggestive of radiculopathy." (Tr. at 412.) A follow-up appointment on May 7, 2014 indicated that Claimant's headache and back pain was mild, but still ongoing; assessments of Claimant's condition were listed as concussion in October 2012, headache, back pain, lumbar/lumbosacral disc degeneration, and depression. (Tr. at 486.)

Consultative Examination Report

On October 18, 2012, Kara Gettman-Hughes, M.A. provided a mental status examination of Claimant. (Tr. at 298-305.) Claimant was generally cooperative for the interview. (Tr. at 301.) Claimant's mother accompanied him to the examination. (Tr. at 298.) It was noted that Claimant's posture was slouched and he had a slightly unsteady gait. (Id.) Claimant reported that his left leg

constantly hurt, his femur having been broken in six places and left ankle crushed by a pumping jack when he was eleven years old. (Tr. at 299.) Due to the pain in his left leg and swelling, Claimant reported that he left work, and that he was depressed. (Id.) Claimant reported feeling sad, helpless, and hopeless, and experienced panic attacks. (Id.) The constant pain caused Claimant to feel frustrated by his physical limitations. (Id.)

Despite denial of a history of alcohol abuse, Ms. Gettman-Hughes noted Claimant reported three DUIs. (Id.) The only medical record available to Ms. Gettman-Hughes for the interview was from Roane County General Medical Clinic that included a follow-up visit and assessment with Dr. Grant Parkins, identified by Claimant as his treating physician, indicating a diagnosis of anxiety with depression. (Tr. at 300.) Claimant reported prior concussions, with one occasion caused by someone hitting him in the back of the head, necessitating an emergency room visit. (Id.) Claimant indicated that he smoked one pack of cigarettes per day and consumes a few beers a week. (Id.) Claimant reported that he graduated from Roane County High School and was in special education classes, though he was required to read and write for his jobs in the oil fields and on an oil rig; he obtained his driver's license by taking the written examination portion orally. (Id.)

The mental status examination revealed that Claimant was oriented to all spheres, though he was unaware of the location of the interview. (Tr. at 301.) Claimant's mood was irritable and affect was restricted. (Id.) Thought processes and content were not abnormal, however, Ms. Gettman-Hughes noted that Claimant's judgment was moderately impaired based on his responses to comprehension questions. (Id.) Claimant's insight was noted to be poor based on his responses to comprehension of social awareness. (Id.) There was no evidence of abnormal psychomotor behavior or suicidal/homicidal ideation. (Id.) Claimant's recent memory was mildly impaired; his remote memory was considered fair. (Id.) Claimant's concentration was considered mildly

13

impaired, though his persistence and pace were deemed normal. (Id.)

Based on the review of the records and the interview, Claimant's diagnoses were major depressive disorder, recurrent, moderate without psychotic features, generalized anxiety disorder, pain disorder associated with both psychological factors and a general medical condition, and alcohol abuse. (Id.) Claimant's prognosis was deemed poor, though he appeared capable of managing his funds. (Tr. at 303.)

Consultative Examination Report:

On November 13, 2012, Claimant presented to Kip Beard, M.D. for an internal medicine examination. (Tr. at 306-312.) Dr. Beard noted that Claimant ambulated with a moderate left limp, without aids; though Claimant could stand unassisted, he had a mild degree of difficulty arising from a seat and getting onto the examination table. (Tr. at 308.) Dr. Beard noted that Claimant appeared uncomfortable with back pain in supine position. (Id.) Examination of the cervical spine was unremarkable with no limitation in range of motion. (Tr. at 309.) Dr. Beard noted mild left shoulder pain with some tenderness, otherwise, normal range of motion; right shoulder, both elbows and wrists had normal motion. (Id.) Dr. Beard found no physical limitations in Claimant's hands. (Id.) Regarding Claimant's knees, Dr. Beard found the right knee normal, and having a normal range of motion; the left knee had significant atrophy, valgus deformity, palpable bony ridging at the joint margins, crepitus was present and the range of motion was limited on restriction and not just complaints of pain, to 80 degrees, and extension to 20 degrees. (Id.) Claimant's right ankle and its range of motion were normal, however, his left ankle had extensive scarring about the lateral and medial ankle as well as valgus deformity and no range of motion, basically fused in neutral position. (Id.)

Dr. Beard's examination of Claimant's lumbosacral spine/hips revealed right scoliosis with

14

left paravertebral muscular spasm. (Id.) Claimant had difficulty standing on the left leg alone, flexion was limited to 70 degrees, but otherwise normal range of motion. (Id.) Seated straight leg raising test was to 90 degrees bilaterally with back discomfort; supine straight leg raising test was to 70 degrees bilaterally with back discomfort. (Id.) Dr. Beard noted extensive scarring and skin grafting in the buttock and lower back region posteriorly. (Id.) Claimant's left hip revealed restriction with motion testing with flexion of 75 degrees, extension of 15 degrees and abduction of 20 degrees, otherwise normal range of motion. (Id.) Dr. Beard found Claimant's left buttock, thigh, calf and foot had either atrophy or muscle loss, and noted weakness in the left leg from the hips down. (Id.) Claimant's effort on manual muscle testing was good. (Id.)

Dr. Beard was unable to elicit reflexes of Claimant's left leg due to Claimant's pain. (Tr. at 310.) Claimant was unable to heel-walk or toe-walk on his left, and had difficulties with tandem walking, and was unable to squat, particularly with arising from a half-way squat position. (Id.) As a result of Claimant's left femur fracture, and degloving injury of the lumbar and pelvic girdle, Dr. Beard found the left leg severely atrophied, with deformity of the left knee, motion loss and weakness that extended to Claimant's left thigh and buttock. (Id.) Dr. Beard also noted Claimant had motion loss in his back, mild scoliosis, and leg length discrepancy. (Id.) Claimant exhibited moderate limping on his left. (Id.)

State Agency Psychiatric Review Technique (PRT)

Dated November 13, 2012, Debra Lilly, Ph.D., performed a PRT of Claimant and found that his Affective Disorders, Anxiety Disorders, and Substance Addiction Disorders caused mild restrictions in Claimant's activities of daily living, maintaining social functioning, maintaining concentration, persistence and pace, and no repeated episodes of decompensation. (Tr. at 89.) Dr. Lilly found no evidence to establish "C" criteria of listings. (Id.) Dr. Lilly based her opinion on

15

evidence obtained during a prior administrative hearing[6], as well as Claimant's responses to the ADL form. (Id.) Dr. Lilly's opinion was affirmed by Frank Roman, Ed.D., during reconsideration on February 13, 2013. (Tr. at 100-102.)

State Agency RFC Assessment:

Dated November 27, 2012, Dr. Atiya M. Lateef, M.D., provided a physical RFC assessment of Claimant to perform sedentary work. (Tr. at 90-94.) Dr. Lateef opined that Claimant could lift, carry, push and/or pull 20 pounds occasionally and ten pounds frequently; stand and/or walk for four hours and sit for six hours during an eight-hour workday. (Tr. at 91.) Claimant could occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 91-92.) Dr. Lateef opined that Claimant had no manipulative, visual or communicative limitations. (Tr. at 92.) Claimant had no limitations with regard to wetness, humidity, noise or vibration, however, Dr. Lateef opined that Claimant was to avoid concentrated exposure to cold, heat, and fumes, odors, dusts, gases, poor ventilation, etc., as well as avoid all exposure to hazards. (Id.) Dr. Lateef further assessed Claimant's limitations to avoid unprotected climbing, and heights and hazards. (Id.) Dr. Lateef's opinion was affirmed by Dr. Caroline Williams, M.D., during reconsideration on February 12, 2013. (Tr. at 103-105.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence due to alleged errors committed by the ALJ:

For starters, the ALJ failed to perform the requisite analysis at step three to determine if Claimant's impairments met Listing 1.02(A); Claimant contends that this error is highlighted by the new evidence from the Bone and Joint Surgeons, Inc. that was submitted to the Appeals

---

[6] Tr. at 71-77.

Council. (Document No. 12 at 11-16.) Claimant asserts that the ALJ's finding that his degenerative joint disease of his left knee and ankle were severe impairments, and affording "significant weight" to Dr. Kip Beard's conclusions regarding same should have met or equaled Listing 1.02(A). (Id. at 12-13.) Claimant further alleges that there was additional medical evidence in the record that would also have supported a finding that his impairments met Listing 1.02(A). (Id. at 13-14.) Claimant contends that the ALJ's failure to explain or evaluate all the medical evidence at step three essentially skipped that step, an error that necessitates remand. (Id. at 15.) Further, the new evidence from the Bone and Joint Surgeons, Inc. included evidence of the physical examination by Dr. Jason A. Castle that proved Claimant had reduced range of motion of his left knee as well as severe degenerative change of the left knee, post traumatic changes of the distal femur and that the lateral tibial plateau of the left knee had collapsed. (Id. at 16.) Claimant's medical records showed that his left knee and ankle had "gross anatomical deformity", "signs of limitation of motion," and "inability to ambulate effectively" which was documented in this new evidence, as well as in the other evidence before the ALJ, all of which are requirements under Listing 1.02(A). (Id.)

In addition, Claimant argues that the ALJ erred by failing to account for his mental impairments, which were assessed at moderate, when he developed the RFC. (Id. at 16-20.) The ALJ found Claimant's mental impairments, including major depressive disorder, generalized anxiety disorder, pain disorder, and alcohol abuse, were all severe impairments, and further found Claimant had moderate difficulties in social functioning and in concentration, persistence and pace, but neglected to consider these moderate limitations in his RFC assessment. (Id. at 16-17.) Claimant points out that the prior fully favorable ALJ decision was set aside due to a step one finding regarding substantial gainful employment, but all the same paragraph B findings made by

the ALJ therein were the same in the current proceeding, thereby lending itself to reason that the ALJ erred by not considering these additional mental impairments. (Id. at 18-19.) Claimant compares this situation to the one presented in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015.) where remand was necessary because the ALJ found moderate mental limitations related to concentration, persistence or pace but failed to either explain why the limitations were not considered in the RFC or presented in a hypothetical to the vocational expert. (Id. at 19.) In short, Claimant contends remand is appropriate because the ALJ made a deficient RFC finding or alternatively, gave an incomplete hypothetical to the VE. (Id. at 20.)

In response, the Commissioner asserts that substantial evidence supports the ALJ's decision finding Claimant not disabled because Claimant did not meet or equal the impairments in Listing 1.02(A). (Document No. 13 at 12-17.) Pursuant to Sullivan v. Zebley, 493 U.S. 521, 530 (1990), Claimant had to prove the he met "all of the specified medical criteria" in Listing 1.02(A). (Id. at 12.) Of critical importance here, is that Claimant had to prove that he had the inability to ambulate effectively, which is defined as "an extreme limitation of the ability to walk." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(b)(1). (Id. at 13.) Further, this is defined as "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." (Id.) Examples of such devices are a walker, two crutches, or two canes. 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(b)(2). (Id.) The Commissioner argues there is no evidence in the record showing that Claimant met this standard: Dr. Beard noted that Claimant ambulated with a moderate left limp, though he did not use an ambulatory aid or appeared to require one; after he was treated for pneumonia and lung contusion, Claimant ambulated about the room without significant difficulty; Dr. Dave noted Claimant had a normal gait, despite the atrophy in his lower left leg;

Claimant admitted he did not use ambulatory assistive devices in his form Adult Function Report; and Claimant reported his daily routine included walking his dogs. (Id.) The Commissioner points out that these instances support the ALJ's finding that Claimant did not meet Listing 1.02(A) because he was able to ambulate effectively. (Id.) See Richardson v. Colvin, No, 2:14-cv-13354, 2015 WL 4772399, at *21 (S.D.W. Va. May 18, 2015), adopted by, 2015 WL 4772412 (S.D.W. Va. Aug. 12, 2015) (claimant did not prove he had the inability to ambulate effectively where he did not use an assistive device limiting the "functioning of both upper extremities," used at most a single cane, and took his daughter to the park, school, and the movies). (Id.) The Commissioner underscores that the ALJ assigned great weight to Dr. Beard's opinion, which noted that Claimant did not use an ambulatory aid, and did not appear to require one. (Id.)

The Commissioner also argues that Claimant's argument for remand and reliance on Radford v. Colvin, 734 F.3d 288 (4th Cir. 2013) and Fox v. Colvin, No. 14-2237, 2015 WL 9204287 (4th Cir. 2015) is misplaced. In the case at bar, unlike the matters therein, there is no conflict of evidence that remained unresolved for judicial review. (Id. at 14-15.) In the case at bar, the evidence is not in conflict where Claimant can ambulate effectively, and may use an assistive device, but does not. (Id. at 15.) See Flesher v. Colvin, No. 2:14-cv-30661, 2016 WL 1271511, at *3-4, 7-8 (S.D.W. Va. Mar. 31, 2016) (Johnston, J.); Glenn v. Colvin, No. 3:14-25969, 2016 WL 1178783, at *3 (S.D.W. Va. Mar. 24, 2016). (Id.) Further, the Commissioner contends that the evidence[7] submitted to the Appeals Council does not require remand because it is neither "new" nor "material" within the meanings espoused under 20 C.F.R. § 404.970(b); Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991); Sullivan v. Finkelstein, 496 U.S.

---

[7] This is the medical evidence concerning Claimant's follow-up visit with Dr. Jason Castle at the Bone and Joint Surgeons, Inc. on May 2, 2014, discussed supra.

617, 626 (1990); and <u>Borders v. Heckler</u>, 777 F.2d 954, 955 (4th Cir. 1985). (<u>Id</u>. at 16.)

With regard to Claimant's arguments that the ALJ erred by implementing his mental limitations in his RFC assessment, the Commissioner argues that the case at bar is also distinguishable from <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir. 2015): the ALJ explained that the limitations identified in the "paragraph B" criteria were not a RFC assessment, but used to rate the severity of Claimant's mental impairments at steps 2 and 3 of the sequential evaluation process, and further determined whether the impairments met the listings criteria. (<u>Id</u>. at 18.) Also, the ALJ included the degree of limitations provided by the paragraph B criteria, therefore further mental restrictions were unnecessary. (<u>Id</u>.) The ALJ accounted for Claimant's moderate limitations in concentration, persistence or pace by limiting him to jobs that did not require above a sixth grade reading or writing level. (<u>Id</u>.) Claimant reported problems with reading, that he attended special educations classes, the he had his mother attend to his finances, and that he could follow spoken instructions despite the mild impairments found in concentration and recent and remote memory, and normal persistence and pace in the consultative examination, thus, the ALJ properly included those restrictions by limiting reading and writing to a sixth grade level. (<u>Id</u>.) Further, the ALJ discussed the evidence of Claimant's social functioning and found that it did not lend itself to specific limitations of Claimant's ability to work. (<u>Id</u>. at 19.)

Claimant finally asserts that the ALJ's finding that Claimant did not meet any of the requirements of Listing 1.02(A) is factually false, because the evidence of record clearly showed that Claimant met the requirements, and contends <u>Radford v. Colvin</u> and <u>Fox v. Colvin</u> are controlling on this issue. (Document No. 14 at 2.) The ALJ himself summarized the existence of such evidence at step two, but then summarily denied the they met the requirements at step three, without any explanation, essentially, this Court is tasked to guess why the ALJ arrived at the

decision he did, because he failed to explain how he came to his conclusions, therefore precluding meaningful judicial review. (Id. at 3.) Moreover, Claimant argues that Flesher v. Colvin has no application to the case at bar. (Id. at 4.) The ALJ did not question Claimant as to whether he satisfied the durational requirement at any step in the sequential evaluation, and further, he did not cite to any evidence in the record that indicated Claimant's gait and stance were normal in order to justify his decision. (Id.)

    Further, Claimant contends that the Commissioner provides post hoc explanation for why Claimant did not meet the requirements of Listing 1.02(A) by redefining "inability to ambulate effectively" pursuant to Listing 1.00(b)(2), which does not cure the ALJ's errors. (Id. at 4-5.) See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 50 (1983); citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 151, 168 (1962); Luster v. Astrue, 2011 WL 2182719 (D.S.C. 2011); Tanner v. Astrue, 2011 WL 2313042 (D.S.C. 2011). (Id. at 5.) Other such examples of the inability to ambulate effectively from Listing 1.00(b)(2) are "the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." (Id.) The record before the ALJ included evidence that Claimant was unable to walk at a reasonable pace on rough or uneven surfaces which satisfied this listing requirement. (Id.)

    Despite the Commissioner's contention that this case is distinguishable from Mascio, Claimant contends that the ALJ's boilerplate paragraph B language did not explain why Claimant's moderate mental impairments were not included as limitations in his RFC assessment. (Id. at 6-8.) Claimant further argues that the Commissioner's argument that the ALJ's specific notation that

the paragraph B criteria were only used in determining the severity of the mental impairment and whether the impairment met the listings criteria is in contravention of the regulations. (Id. at 7-8.) 20 C.F.R. § 404.1520a(d)(2)-(3) requires the ALJ to use the "special technique" to assess the claimant's RFC where the severe mental impairment(s) did not meet or equal a listing, thus the ALJ's failure to include RFC limitations for Claimant's moderate difficulties in social functioning, concentration, persistence or pace was in error. (Id. at 8.)

Step 3 Analysis

Basically, Claimant alleges that the ALJ erred because he did not fully explain how Claimant's severe impairments did not meet section 1.02(A), but only provided a negative recitation of the criteria, and that omission requires remand. (Document No. 12 at 14-15.) Pursuant to Sullivan v. Zebley, 493 U.S. 521, 530 (1990), Claimant had to prove the he met "all of the specified medical criteria" in Listing 1.02(A). Arguably, the medical evidence supported "characteristics of gross anatomical deformity, chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and finding on appropriate medically acceptable imagining of joint space narrowing, bone destruction, or ankylosis of the affected joint(s) with involvement of one major peripheral weight bearing joint" but not all these criteria in combination supported the argument that Claimant had the inability to ambulate effectively, or "an extreme limitation of the ability to walk" pursuant to 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(b)(1). There is simply no evidence in the record suggesting Claimant was handicapped to that degree, despite having a limp on his left side. The medical evidence showed, and the ALJ found, that Claimant's daily activities included walking his dogs. (Tr. at 17,18.) Of significance here, the ALJ considered Dr. Beard's opinion as well as the DDS State agency

consultant opinions and gave more weight to Dr. Beard's findings specifically because the medical records supported Claimant's claim of left leg impairments, however, the ALJ's finding that Claimant did not meet <u>all</u> requirements under 1.02(A) is appropriate because there was no evidence supporting that Claimant was unable to ambulate effectively. (Tr. at 15, 21.) In short, the ALJ properly considered Claimant's impairments under the requirements of 1.02(A), and finding that he did not meet all the requirements is supported by substantial evidence.

<u>The RFC Assessment</u>

Claimant also alleges that the ALJ erred in assessing the RFC, specifically where the ALJ found that Claimant had moderate difficulties in social functioning and in concentration, persistence or pace, but did not discuss these limitations in formulating his RFC, or alternatively, did not provide a hypothetical to the VE that included these limitations. (Document No. 12 at 16-20.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 1996 WL 374184, *1 (July 2, 1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." <u>Id</u>. at *5. The Ruling requires that the ALJ conduct a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." <u>Id</u>. at *3. This function-by-function analysis enables the ALJ to determine whether a claimant is capable of performing past relevant work, the appropriate exertional level for the claimant, and whether the claimant is "capable of doing the full range of work contemplated by the exertional level." <u>Id</u>. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts

(e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." <u>Id</u>. at *7. The ALJ also must "explain how any material inconsistencies or ambiguities, in the evidence in the case record were considered and resolved." <u>Id</u>.

Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 404.1545(a) (2014). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id</u>. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." <u>Ostronski v. Chater</u>, 94 F.3d 413, 418 (8th Cir. 1996).

In <u>Mascio v. Colvin</u>, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." <u>Id</u>. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. <u>Id</u>. The Fourth Circuit further noted that a per se rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested.'" <u>Id</u>. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the

ALJ's analysis frustrate meaningful review." Id. (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)); see also, Ashby v. Colvin, Civil Action No. 2:14-674 (S.D. W.Va. Mar. 31, 2015).

In this case, Claimant's credibility had a significant effect on the ALJ's RFC assessment, which he noted in his decision. (Tr. at 20-22.) Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) The medical signs and laboratory findings; (2) Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

With regard to Claimant's moderate difficulties in social functioning, the ALJ found evidence to support this limitation: Claimant did not go to the store or run errands, or go to the movies, the mall, church, or to exercise, but he did visit with family and friends on a frequent basis. (Tr. at 17.) When drinking with his friends, Claimant would get involved in altercations: on one

occasion, he was kicked in the head; once he was struck with a baseball bat; and another time, he was kicked in the chest by a female. (Tr. at 17-18.)

With regard to concentration, persistence or pace, the ALJ found that Claimant exhibited moderate difficulties there as well: he relied on reminders to take his medications, and he had problems with reading (he was in special education classes throughout school), but could understand spoken instructions. (Tr. at 18.) The ALJ noted that Claimant also had impairments with concentration, recent and remote memory, and his mother managed his finances. (Id.) The ALJ found that the evidence failed to establish the presence of "paragraph C" criteria, however. (Tr. at 18-19.) It is noted that the ALJ expressly did not employ the aforementioned limitations in his RFC assessment, but instead used them to rate the severity of the mental impairments at steps 2 and 3 of the sequential evaluation process. (Tr. at 19.) The ALJ composed the RFC to reflect the degree of limitation imposed by the "moderate" difficulties found. (Id.)

In this case, the ALJ properly considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based upon the requirements of 20 C.F.R. § 404.1529 and SSRs 96–4p and 96–7p. (Id.) In so doing, the ALJ properly followed the two-step process in which it must first be determined whether there was an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Claimant's symptoms. (Tr. at 19-20.) And second, the ALJ evaluated the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit his functioning. (Tr. at 20.) Only to the extent that the limitations were not substantiated by objective medical evidence did the ALJ make findings as to the credibility of statements based on a consideration of the entire case record. (Id.)

It is important to note that in <u>Mascio</u>, the Court determined that nowhere did "the ALJ explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's residual functional capacity." 780 F.3d at 640. It was this "lack of explanation," the Court held, which "requires remand." <u>Id</u>.

Here, the ALJ clearly stated that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. at 20.) This distinguishes the case at bar to the matter in <u>Mascio</u>. The ALJ found Claimant made allegations that were not supported by the objective evidence of record that negatively impacted Claimant's credibility, which was further diminished by his inconsistent statements regarding the amount and frequency of his alcohol consumption[8], and how he was hit in the head by a baseball bat. (<u>Id</u>.) The ALJ found that the x-ray of Claimant's lumbar spine showed "only slight scoliotic curvature with convexity to the left" and that Claimant's prescriptions "have been relatively effective in controlling [his] symptoms", specifically, his depression. (Tr. at 20-21.)

Regarding his allegation of the debilitating pain in his left leg, the ALJ found that Claimant drove 1500 miles to work in North Dakota immediately prior to the alleged onset date, because Claimant believed he could do the work, and that Claimant was fired from that job not due to his inability to perform the work, but because he spilled diesel oil. (Tr. at 21.) Finally, the ALJ determined that Claimant's "subjective symptoms lack credibility to the extent that they purport

---

[8] The ALJ noted that Claimant "maintained that alcohol has never affected his ability to work or his relationships and he has never received alcohol abuse treatment." (Tr. at 20.) Though the ALJ did not find alcohol abuse material to the disability claim, he found it impacted Claimant's credibility insofar as it "establish[ed] that the claimant can afford alcohol, even though he cites a lack of resources and insurance as a reason for not getting more treatment." (Tr. at 21.)

to describe a condition of disability for Social Security purposes. While he does have medically determinable impairments that could reasonably be expected to produce symptoms, the claimant's testimony and statements describing the duration, frequency, intensity and other limiting affect are not consistent with the objective medical evidence of record." (Tr. at 22.)

Nevertheless, Claimant's alleged difficulties with reading and writing and his history of having graduated high school while attending special education classes, which the ALJ found to limit Claimant to a sixth grade reading or writing level, was included in the RFC assessment, and was supported by the hypothetical administered to the VE. (Tr. at 18, 19, 22, 54, 62.) The ALJ specifically rejected "further hypothetical questions, as the objective credible evidence of record does not support them." (Tr. at 23.) In short, the ALJ did not make an incomplete RFC assessment, or fail to include the moderate difficulties in the hypothetical to the VE that would necessitate remand under Mascio, and furthermore, the ALJ provided sufficient explanation for his conclusions in the decision, which is supported by the substantial evidence.

Evidence Submitted to the Appeals Council

Claimant also argues that remand is required for consideration of his May 2, 2014 physical examination by Dr. Jason A. Castle. (Document No. 12 at 15-16.) In considering Claimant's argument for remand, it is initially noted that the social security regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence. 42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97-98, 111 S.Ct. 2157, 2163, 115 L.Ed.2d 78 (1991). Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence. 42 U.S.C. §

28

405(g); <u>Melkonyan</u>, 501 U.S. at 98, 111 S.Ct. at 2163. The Supreme Court has explicitly stated

that these are the only kinds of remand permitted under the statute. <u>Melkonyan</u>, 501 U.S. at 98,

111 S.Ct. at 2163.

Pursuant to 28 U.S.C. § 405(g), remand is warranted "upon a showing that there is new

evidence which is material and that there is good cause for the failure to incorporate such evidence

into the record in a prior proceeding[.]" If new and material evidence is submitted after the ALJ's

decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or
> before the date of the administrative law judge hearing decision. The Appeals
> Council shall evaluate the entire record including the new and material evidence
> submitted if it relates to the period on or before the date of the administrative law
> judge hearing decision. It will then review the case if it finds that the administrative
> law judge's action, findings, or conclusion is contrary to the weight of the evidence
> currently of record.

20 C.F.R. §§ 404.1570(b); 404.970(b) (2013). Evidence is "new" if it is not duplicative or

cumulative. <u>Wilkins v. Secretary, Dep't of Health & Human Serv.</u>, 953 F.2d 93, 96 (4th Cir. 1991)(*en

banc*). "Evidence is material if there is a reasonable possibility that the new evidence would have

changed the outcome." <u>Id</u>. The Regulations governing the circumstances under which the Appeals

Council is to review an ALJ decision shows that additional evidence will not be considered *unless*

the evidence is new and material and relates to the period on or before the date of the ALJ decision.

<u>See</u> 20 C.F.R. §§ 404.1570(b); 404.970(b) (2013). This does not mean that the evidence had to have

existed during that period. Rather, evidence must be considered if it has any bearing upon whether the

claimant was disabled during the relevant period of time. <u>See</u> <u>Wooldridge v. Bowen</u>, 816 F.2d 157,

160 (4th Cir. 1987); <u>Cox v. Heckler</u>, 770 F.2d 411, 413 (4th Cir. 1985); <u>Leviner v. Richardson</u>, 443

F.2d 1338, 1343 (4th Cir. 1971). "Pursuant to the regulations . . . , if additional evidence submitted

by a claimant does not relate to the time period on or before the ALJ's decision, the evidence is

returned to the claimant, and the claimant is advised about her rights to file a new application."
Adkins v. Barnhart, 2003 WL 21105103, *5 (S.D. W.Va. May 5, 2003).

As discussed above, the evidence submitted to the Appeals Council consisted of a physical examination where Dr. Castle observed Claimant had a reduced range of motion of the left knee and x-rays of same showed severe degenerative changes, post traumatic changes of the distal femur, as well as evidence that the lateral tibial plateau of the left knee had collapsed. (Tr. at 487-491.) Dr. Castle recommended Claimant to maintain an active lifestyle, and stated that he "may" use an assistive device. (Tr. at 488.) The undersigned notes that this physical examination occurred well over a month prior to the administrative hearing, that there is no indication as to why this evidence was not submitted for the ALJ's consideration, and that there was no good cause provided as to why this evidence had to be submitted directly to the Appeals Council, nevertheless, the undersigned finds that Claimant has not demonstrated how the evidence is "new" or "material": indeed, though it does relate to the time period on or before the ALJ's decision, Dr. Castle's observations mirror those of Dr. Kip Beard[9], a State agency consultant, who observed the same range of motion limitations, including the degenerative changes in the left knee and ankle, as well as Claimant's non-use of an ambulatory aid. (Tr. at 306-310.) In short, the undersigned finds that the evidence from the Bone and Joint Surgeons, Inc. (Tr. at 487-491.) is duplicative of the evidence in the record considered by the ALJ, and not material because it would not have reasonably changed the outcome of the proceeding.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's

---

[9] This was Dr. Beard's second examination of Claimant; the first examination took place in 2010 due to Claimant's first application for benefits.

Motion for Judgment on the Pleadings (Document No. 13.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.   Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: September 20, 2016.

Omar J. Aboulhosn
United States Magistrate Judge